RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 20a0154p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

JANE DOE,

>
> *Plaintiff-Appellant*,
>

*v.*

No. 19-5156

UNIVERSITY OF KENTUCKY, et al.,

> *Defendants-Appellees*.

Appeal from the United States District Court
for the Eastern District of Kentucky at Lexington.
No. 5:17-cv-00345—Joseph M. Hood, District Judge.

Argued:  October 16, 2019

Decided and Filed:  May 18, 2020

Before:  BATCHELDER, DONALD, and READLER, Circuit Judges.

_____

### COUNSEL

**ARGUED:**  Tad Thomas, THOMAS LAW OFFICES, PLLC, Louisville, Kentucky, for
Appellant.  Bryan H. Beauman, STURGILL, TURNER, BARKER & MOLONEY, PLLC,
Lexington, Kentucky, for Appellees.  **ON BRIEF:**  Tad Thomas, Lindsay Cordes, THOMAS
LAW OFFICES, PLLC, Louisville, Kentucky, for Appellant.  Bryan H. Beauman, Jessica R.
Stigall, STURGILL, TURNER, BARKER & MOLONEY, PLLC, Lexington, Kentucky, William
E. Thro, UNIVERSITY OF KENTUCKY, Lexington, Kentucky, for Appellees.

_____

### OPINION

_____

ALICE M. BATCHELDER, Circuit Judge.  Jane Doe alleges that the University of
Kentucky (UK) violated Title IX of the Education Amendments of 1972 (Title IX), 86 Stat. 373,

*codified at* 20 U.S.C. § 1681, *et seq*., by responding with deliberate indifference to her accusations of student-on-student harassment. Because Jane Doe failed to show that UK's response subjected her to further actionable harassment that caused Title IX injuries, we **AFFIRM** the district court's grant of summary judgment.

**I.**

During her freshman year at UK, Jane Doe reported two separate rapes to UK, accusing two different male UK students of raping her on two different nights.[1] Her Title IX claims are based on UK's response to those accusations.

*Jane Doe's Accusations Against John Doe*: On August 20, 2016, Jane Doe attended a fraternity party where she met John Doe. John Doe and Jane Doe left the party together, holding hands on their way back to his apartment. Once they arrived, they drank vodka and orange juice in the living room. John Doe eventually kissed her, and the two moved to his bedroom. As their physical intimacy continued, Jane Doe asked if he had a condom and they began to have sex. Jane Doe remembers asking him to stop mid-intercourse; John Doe denies that she made such a request. Later that night, John Doe walked her home, asked for her number, and kissed her goodnight.

Jane Doe subsequently told several friends that John Doe had raped her. On September 13, 2016, one of these friends reported the incident to UK, and representatives from UK's Title IX office immediately met with Jane Doe. On October 6, 2016, UK issued a no-contact order that directed John Doe to "cease any and all contact" with Jane Doe and began its investigation into the alleged rape. R. 13-5, PagID# 508.

Throughout the investigation, Jane Doe reported several encounters with John Doe. In November 2016, Jane Doe left a fraternity tailgate party feeling "extremely uncomfortable and unsafe" because John Doe stood "within mere feet" of her and "stared her down several times," and, a day after the party, John Doe followed her home from class. R. 18-1, PageID#: 703, 784.

---

[1]The parties and the district court have used the names "Jane Doe" for the plaintiff and "John Doe" and "James Doe" for the accused students. For consistency and ease of reference, we do likewise.

The Title IX office questioned John Doe about both incidents and determined that the no-contact order had not been violated.

Months later, Jane Doe saw John Doe again while she was walking to class. Jane Doe said that he "looked right at [her]" and it "caused [her] to have a panic attack." R. 18-1, PageID#: 762. She said that his eye contact made her feel "incredibly intimidated, terrified, and quite frankly stalked." *Id.* She also reported that John Doe habitually sat in her vicinity at the library, forcing her to leave on multiple occasions. Jane Doe described feeling "terrified all the time" and that she went to the library "from midnight – 8 am because that was the only time that [she] felt safe[.]" *Id.* at 62. Jane Doe asked UK to ban John Doe from a certain floor in the library, but UK declined to "restrict the movement of either [student] within an academic building." *Id.* at 60–61.

UK's investigation of the alleged rape involved interviewing Jane Doe and John Doe, as well as several student-witnesses. UK also reviewed documentary evidence, including text messages between relevant parties. UK initially concluded that the evidence was insufficient to proceed to a hearing before the school's Sexual Misconduct Hearing Panel (Panel). But when UK informed Jane Doe of this decision, she became "extremely upset and emotional" and "plea[ded]" with the Title IX office to reconsider. R.1, PageID#: 10. UK acquiesced and the Panel held a hearing on March 3, 2017.

According to UK's administrative regulations, the accuser and the accused are each entitled to assistance by two "support persons" during the hearing. R. 18-5, PageID#: 1181–82. Although these support persons may be attorneys, they cannot "represent, speak on behalf of, delay, disrupt, or otherwise interfere" with the proceedings. *Id.* at 1178, 1181–82. John Doe had two attorneys represent him. Nicholas Kehrwald, UK's Interim Dean of Students, acted as the complainant and presented evidence to the Panel on Jane Doe's behalf.

Jane Doe alleges that Kerhwald failed to adequately represent her interests at the hearing. She says that Kerhwald failed to object when John Doe's attorneys actively participated at the hearing by examining and cross-examining witnesses. Jane Doe also says that Kehrwald did not introduce evidence of a voicemail that she left her friend on the night of the alleged rape. And

when Jane Doe asked the Panel officer to include the voicemail as evidence, John Doe's attorneys successfully argued against its admission.

The Panel found John Doe innocent of the alleged sexual misconduct by a preponderance of the evidence. Jane Doe filed an appeal with the Sexual Misconduct Appeals Board (Appeals Board), arguing that her due process rights were violated and that the hearing was fundamentally unfair. The Appeals Board disagreed and upheld the Panel's decision.

*Jane Doe's Accusations Against James Doe*: On October 8, 2016,[2] Jane Doe attended a football tailgate hosted by James Doe's fraternity. Jane Doe, who had been drinking heavily, accepted James Doe's invitation to accompany him back to his apartment. But she says that once they reached James Doe's apartment, she had difficulty staying awake and that James Doe raped her while she was incapacitated.

Jane Doe reported the assault to the UK Police Department and her friends notified UK's Title IX office. The Title IX office immediately met with Jane Doe and issued a no-contact order. On November 11, 2016, Jane Doe requested that James Doe be removed from their shared classes because he stared at her and made her uncomfortable. The Title IX office called and sent several emails to James Doe, notifying him that he needed to move sections. But James Doe ignored the correspondence and continued to attend classes with Jane Doe.

UK began a formal investigation into the alleged rape in January 2017. A month later, the Title IX office presented its investigative report and a hearing was held in April. Despite being served with notice of the hearing, James Doe failed to appear, and the Panel found that he violated UK's sexual misconduct policy. James Doe was subsequently dismissed from UK.

Jane Doe brought two Title IX claims against UK and several UK officials, arguing that the school's response to student-on-student harassment was clearly unreasonable because it caused a hostile educational environment and vulnerability to further harassment. She also alleged that the school demonstrated deliberate indifference by failing to follow UK's policies throughout the investigation and hearing processes.

---

[2]This was two days after Jane Doe had requested and obtained the no-contact order against John Doe.

UK moved to dismiss Jane Doe's complaint pursuant to Federal Rule of Civil Procedure 12(b)(6) and attached to its motion certain items from the disciplinary proceedings and investigations. Because the district court considered matters outside the pleadings, it treated UK's Rule 12(b)(6) motion as one for summary judgment under Federal Rule of Civil Procedure 56, *see Doe v. Univ. of Ky.*, 361 F. Supp. 3d 687, 689 (E.D. Ky. 2019) (citing *Song v. City of Elyria*, 985 F.2d 840, 842 (6th Cir. 1993)), and found that Jane Doe failed to allege a triable issue of fact as to whether UK was deliberately indifferent to student-on-student harassment and granted UK's motion. *Id.* at 698, 702–03.

## II.

In *Davis v. Monroe County Board of Education*, 526 U.S. 629, 643 (1999), the Supreme Court held that "in certain limited circumstances" a federally funded university may be directly liable under Title IX for its inadequate response to allegations of student-on-student harassment. The *Davis* Court held that a university may be liable "only where [it is] deliberately indifferent to sexual harassment, of which [it has] actual knowledge, that is so severe, pervasive, and objectively offensive that it can be said to deprive the victims of access to the educational opportunities or benefits provided by the school." *Id.* at 650.

We recently considered and re-articulated *Davis*'s pleading standard in *Kollaritsch v. Michigan State University Board of Trustees*, 944 F.3d 613, 620–24 (6th Cir. 2019). There, we explained that a plaintiff must plead "actionable sexual harassment," which is sexual harassment that is severe, pervasive, and objectively offensive. *Id.* at 620 (citing *Davis*, 526 U.S. at 651). Severe means "something more than just juvenile behavior"; pervasive means "*multiple* incidents of harassment"; and objectively offensive means "behavior that would be offensive to a reasonable person under the circumstances, not merely offensive to the victim, personally or subjectively." *Id.* at 620–21.

A plaintiff must also allege that the school committed a deliberate-indifference intentional tort, which comprises four elements: (1) knowledge, (2) an act, (3) injury, and (4) causation. *Id.* at 621. The first two elements are satisfied if the school had "actual knowledge" of actionable sexual harassment and responded in a way that was "'clearly

unreasonable in light of the known circumstances,' thus demonstrating the school's deliberate indifference to the foreseeable possibility of *further* actionable harassment of the victim." *Id.* (internal citation omitted) (quoting *Davis*, 526 U.S. at 648, 650). The third element—injury—means the deprivation of "access to the educational opportunities or benefits provided by the school." *Id.* at 622 (quoting *Davis*, 526 U.S. at 650).

But it is the element of causation on which this case turns. In *Kollaritsch*, we explained that, pursuant to *Davis*, a plaintiff must show: (1) that a school's clearly unreasonable response subjected the student to further actionable harassment and (2) that the further harassment caused the plaintiff's Title IX injury. *Id.* at 622–24. So, the school's response "must bring about or fail to protect against the further harassment." *Id.* at 622. A clearly unreasonable response might "be a detrimental action, thus fomenting or instigating further harassment." *Id.* at 623. Or it might be "an insufficient action (or no action at all)" that makes "the victim vulnerable to, meaning unprotected from, further harassment." *Id.*

In short, a Title IX cause of action in the student-on-student-harassment context comprises both actionable sexual harassment and a deliberate indifference intentional tort. A school may be liable only if a plaintiff shows "an incident of actionable sexual harassment, the school's actual knowledge of it, some further incident of actionable sexual harassment, that the further actionable harassment would not have happened but for the objective unreasonableness (deliberate indifference) of the school's response, and that the Title IX injury is attributable to the post-actual-knowledge further harassment." *Id.* at 623–24.

Here, Jane Doe's deliberate indifference claim fails as a matter of law.[3] She argues that she adequately alleged harassment of a severe, pervasive, and objectively offensive nature because rape "constitutes a severe form of sexual harassment that can create a hostile educational environment." Appellant Br. at 18. She says that she notified UK of several post-rape interactions with John Doe and James Doe but UK failed to adequately alleviate her distress.

---

[3]Count 2 of Jane Doe's complaint alleges a violation of Title IX under a hostile environment theory. Hostile environment claims are distinct from deliberate indifference claims. *Doe v. Miami Univ.*, 882 F.3d 579, 589 (6th Cir. 2018). Jane Doe did not develop her hostile environment argument below and failed to raise the claim on appeal. She therefore forfeited the claim and we will not consider it. *See United States v. White*, 920 F.3d 1109, 1114 (6th Cir. 2019).

Her essential argument then is that she adequately pleaded actionable harassment because she alleged rape in the pre-actual-knowledge period compounded by interactions with the accused students in the post-actual-knowledge period.

But allegations of rape in the pre-actual-knowledge period cannot alone show actionable sexual harassment. The relevant inquiry is whether UK's *response* to Jane Doe's accusations subjected her to *further* actionable sexual harassment. And Jane Doe has not pleaded any incident of actionable harassment in the post-actual-knowledge period. She does assert that John Doe stared at her, stood by her at a party, followed her home, and sat near her in the library. She similarly alleges that James Doe stared at her during their shared classes. Nothing about these allegations, however, suggest *sexual* harassment, let alone sexual harassment that is of a severe, pervasive, and objectively offensive nature.[4] *Cf. M.D. ex rel. DeWeese v. Bowling Green. Indep. Sch. Dist.*, 709 F. App'x 775, 778 (6th Cir. 2017) (finding no actionable sexual harassment when the student-victim said that in the post-actual-knowledge period she saw the perpetrator "in the hallway and at a handful of school events").

Even if the post-actual-knowledge interactions could amount to actionable harassment, Jane Doe failed to show that UK's response was clearly unreasonable and that it caused the further harassment. UK met with Jane Doe upon learning of the alleged rapes and took "proactive steps to reduce opportunities for further harassment" by issuing no-contact orders. *See Stiles ex rel. D.S. v. Grainger Cty.*, 819 F.3d 834, 849 (6th Cir. 2016). When Jane Doe reported that the no-contact orders were violated, UK immediately investigated. And UK "promptly and thoroughly" investigated the alleged rapes by reviewing documentary evidence, questioning the accuser and the accused, and interviewing other student-witnesses. *See id.*

---

[4]In *Foster v. Board of Regents of University of Michigan*, 952 F.3d 765, 781 (6th Cir. 2020), *opinion vacated and reh'g granted by* No. 19-1314 (6th Cir. May 15, 2020) (order), the panel held that in making the actionable-sexual-harassment determination, courts may consider "the full scope" of the accused's behavior— "meaning his harassment before and after" the school had actual notice. But that is not what we said in *Kollaritsch*. Rather, plaintiffs must show at least two incidents of actionable sexual harassment to satisfy the pervasive element. One incident may have occurred in the pre-actual-knowledge period; the other in the post-actual-knowledge period. But both incidents must be severe and objectively offensive. So, if a plaintiff alleges that the school's deliberate indifference caused her to suffer from further harassment, that further harassment must be both severe and objectively offensive. Hence, contrary to *Foster*, the Sixth Circuit requires "independent proofs" of severe and objectively offensive harassment "both before *and* after the school had actual knowledge." *See Foster*, 952 F.3d at 782.

After determining that insufficient evidence existed to proceed to a sexual misconduct hearing, UK even acquiesced to Jane Doe's plea to conduct the hearing anyway. The record simply fails to establish that UK took "insufficient action," which made Jane Doe "vulnerable to, meaning unprotected from, further harassment." *See Kollaritsch*, 944 F.3d at 623.

Nor does UK's non-compliance with its own administrative policies amount to deliberate indifference. *Cf. Gebser v. Lago Vista Indep. Sch. Dist.*, 524 U.S. 274, 292 (1998) (holding that "the failure to *promulgate* a grievance procedure does not itself constitute 'discrimination' under Title IX") (emphasis added). First, and most importantly, Jane Doe does not allege that UK's failure to follow the administrative policies caused her further harassment. Second, school administrators are not required to "engage in particular disciplinary action" and courts should not "second-guess[] the disciplinary decisions made by school administrators." *Davis*, 526 U.S. at 648. Third, we have been quite clear that "if a public university has to choose between competing narratives to resolve a case, the university must give the accused student or his agent an opportunity to cross-examine the accuser and adverse witnesses in the presence of a neutral fact-finder." *See Doe v. Baum*, 903 F.3d 575, 578 (6th Cir. 2018). UK's Panel officer therefore reasonably determined that due process required the limited participation of John Doe's attorneys.

**III.**

Because Jane Doe did not plead any further actionable sexual harassment after UK took remedial action in the post-actual-knowledge period, she failed to state a Title IX deliberate indifference claim under *Davis*. She also failed to state material facts that would raise genuine disputes as to whether UK's response was objectively unreasonable or caused any further harassment. We therefore **AFFIRM** the district court's grant of summary judgment to UK.